1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **CENTRAL DISTRICT OF CALIFORNIA**
10
11  MERRILL LYNCH CAPITAL          )   Case No. CV 09-06166-DMG (RZx)
12  SERVICES, INC.,                )   **FINDINGS OF FACT AND**
                                   )   **CONCLUSIONS OF LAW**
13                    Plaintiff,   )
                                   )
14            v.                   )
                                   )
15  APACHE STRUCTURES, LLC,        )
                                   )
16                    Defendant.   )
    _____)
17

18          This matter is before the Court following a bench trial which took place on July 6,
19  2010 through July 9, 2010.  Kenneth Mennemeier of Mennemeier, Glassman, & Stroud
20  LLP appeared on behalf of Plaintiff, Merrill Lynch Capital Services, Inc.  Niloufar
21  Zakariaie of Zakariaie & Zakariaie appeared on behalf of Defendant, Apache Structures
22  LLC.
23          Having carefully reviewed the evidence and the arguments of counsel, as presented
24  at trial and in their written submissions, the Court makes the following findings of fact
25  and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.
26
27
28

# I. **FINDINGS OF FACT**

1. Plaintiff Merrill Lynch Capital Services, Inc. ("MLCS") is a corporation organized under the laws of the State of Delaware. (Trial Ex. #3, at MLCS 000019.) Its principal place of business is in New York, New York. (Trial Ex. # 3, at MLCS 000025.)

2. Defendant Apache Structures LLC ("Apache") is a limited liability company organized under the laws of the State of Nevada, with business operations in Santa Monica, California. (Trial Ex. #3, at MLCS 000019, MLCS 00025.)

## **Apache's Swap Contracts With Merrill Lynch**

3. In July 2007, Apache sought to enter into interest rate swaps to hedge its real estate investments. (Parties' Proposed Final Pretrial Conference Order [Doc. # 61] ("Admitted Facts"), Admitted Fact #1.) In particular, Apache wanted to reduce the risk to Apache from a variable rate loan with Nevada State Bank. (Amended Mikail Decl. [Doc. # 86] ("Mikail Decl.") ¶ 4, July 6, 2010).[1]

4. An interest rate "swap" is a contract by which one party exchanges a cash flow stream based on a fixed-rate of interest on some "notional amount" (e.g., $5,000,000) with a "counterparty" who exchanges a cash flow stream based on a "floating" (i.e., variable) rate of interest on that same notional amount. (Admitted Fact # 2.)

5. In or around July 2007, Apache's manager, Halston Mikail, contacted Ramin Alizadeh, a financial advisor at Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS"). (Admitted Fact # 3.) Alizadeh and his colleague Alan Wong, a MLPFS client associate, assisted Apache in opening accounts through which Apache could enter into interest rate swap contracts. (Admitted Fact #4.)

6. Apache opened a traditional securities brokerage account with MLPFS for the purpose of holding securities and a separate account for the purpose of holding assets

---

[1] Apache's manager, Halston Mikail, filed an amended declaration in connection with the trial which will be referred to as "Mikail Decl." throughout this order.

that Apache pledged as collateral for its swap transactions.  (Wong Decl. [Doc. # 79] ¶ 5, July 6, 2010.)  Mikail was the only individual with authority to act on behalf of Apache with regards to its accounts at MLCS.   (Admitted Fact # 10.)

7.     When Mikail opened Apache's account with MLCS, he had 15 years of investing experience.  (Admitted Fact # 14.)  Although Mikail claimed at trial that he had no prior experience with swap contracts, he indicated on an April 2008 personal and financial data form sent to MLCS that he had five years of such experience.  (Trial Ex. # 26 at MLCS 001023.)  Mikail also had experience with two other swap contracts which were terminated in his favor in February and April 2008.  (Trial Ex. ## 12, 23.)  Regardless of the extent of his experience with swap contracts in particular, Mikail was a sophisticated investor who understood that there would be significant risks involved in swap agreements.  (*See also* Trial Ex. # 3 at MLCS 000041.)

8.     MLCS and Apache entered into a written agreement ("Agreement") which was a version of the International Swaps and Derivatives Association, Inc.'s ("ISDA") standard agreement.  (Admitted Fact ## 5, 6.)  MLPFS served as MCLS's custodian to hold posted collateral under the Agreement.  (Trial Ex. # 3 at MLCS 000037-38.)  MLCS agreed that it would be liable for the acts or omissions of MLPFS.  (Trial Ex. # 3 at MLCS 000959.)

9.     The Agreement sets forth the following pertinent terms:

    a.    "Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine."  (Admitted Fact # 7; Trial Ex. # 3 at MLCS 000026.)

    b.    Paragraph 2, Subsection (a)(i):

"Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions in this Agreement."  (Trial Ex. # 3 at MLCS 000001.)

-3-

c.    Paragraph 2, Subsection (a)(iii):

"Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing . . . ." (*Id.*)

d.    Paragraph 5, Subsection (a)(iv) defines an "Event of Default" as follows:

"A representation (other than a representation made under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated." (Trial Ex. # 3 at MLCS 000005.)

e.    Paragraph 11 regarding "Expenses":

"A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection." (Trial Ex. # 3 at MLCS 000012-13.)

10.    In August 2007, Apache entered into a swap contract with MLCS with a notional amount of $5 million. (Admitted Fact #15.) The contract had an effective date

-4-

of February 19, 2008 and was to terminate ten years later on February 19, 2018.  (Trial Ex. # 6.)

11.     In October 2007, Apache entered into a swap contract with MLCS with a notional amount of $5.1 million.  (Admitted Fact # 16.)  The contract had an effective date of April 23, 2008 and was to terminate 10 years later on April 23, 2018.  (Trial Ex. # 8.)

12.     For each of these swap contracts, MLCS served as Apache's counterparty. Apache agreed to be the "Fixed Rate Payer" while MLCS served as the "Floating Rate Payer."  (Trial Ex. ## 6-9.)  As counterparties, MLCS and Apache acted in their own respective self-interest in an arm's length transaction and were not in the relationship of, for example, a broker and customer.  (Fortgang Decl. [Doc. # 80], Ex. C at 000005, July 6, 2010; Trial Ex. # 103 at 5.)

13.     MLCS required Apache to post two types of collateral in order to protect MLCS against the risk that Apache would be unable to pay for the value of its contracts. (Atwood Decl. [Doc. # 78] ¶¶ 10-11, July 6, 2010.)  Apache posted "upfront collateral" at the beginning of the contract and MLCS kept this collateral for the duration of the contract.  (*Id.*)  MLCS required Apache to post 4% of the notional amount of the two swap contracts at issue (i.e., $404,000) as upfront collateral.  (Trial Ex. ## 7, 9; Mikail Decl. ¶ 9.)  MLCS also required Apache to post additional collateral depending on the fluctuations in the market.  (Atwood Decl. ¶¶ 11, 18; Mikail Decl. ¶ 10.)  These occurrences are commonly referred to as "collateral" or "margin" calls.  (*Id.*)  The two terms are used interchangeably herein.

14.     If Apache failed to meet a collateral call, MLCS had the right to liquidate or "unwind" the swap agreement.  (Mikail Decl. ¶ 10.)  Mikail was very concerned about meeting collateral calls because he understood that failure to do so could result in MLCS exercising *its* right to unwind the swap agreement, which could prevent Apache from recouping its losses over the 10-year life of the contract.  (*See also* Trial Ex. # 18 at MLCS 001230.)

15.     When MLCS issued collateral calls, Alan Wong would typically inform Apache via email and attach a Counterparty Deal Detail Report showing the status of Apache's Collateral Account at the time MLCS generated the report.  (Wong Decl. ¶ 9.)

16.     Citibank held all cash collateral posted by counter-parties in a single account under the name of Merrill Lynch & Co.  (Atwood Decl. ¶ 13.)  MLCS and Citibank kept track of the amount of money paid into the account by each counterparty through a series of book entries.  (Atwood Decl. ¶ 14.)  Once a counterparty informed MLCS that it intended to meet a given collateral call, MLCS would issue a "preadvise" to Citibank. This preadvise alerted Citibank that a certain amount of money would be wired to Merrill Lynch's account.  Citibank could not determine, however, which counterparty was going to send in the money based on MLCS' preadvise.

17.     In April 2008, Apache requested and began receiving regular reports from Merrill Lynch's Client Valuation Group ("CVG Reports").  (Mikail Decl. ¶ 14.)  These reports informed Apache of the "Mark-to-Market" ("MTM") or present value of the swap contracts as of the closing of the market on the prior day.  This value was not available to Apache online or in any other form.  Only Merrill Lynch could calculate the MTM and the value could fluctuate by thousands of dollars overnight.  The CVG reports did not disclose the amount of cash in Apache's collateral account (referred to as "settled cash") or whether there was a deficit or surplus in the collateral account.  (*Id.*)

## The Events of November 2008

18.     In the fall of 2008, the worldwide financial crisis caused interest rates to become highly volatile.  Mikail knew of this volatility and understood that it could greatly affect the value of his swap contracts.  (*See also* Trial Ex. # 18 at MLCS 001230.)

19.     On November 6, 2008, MLCS issued a $210,000 collateral call and Apache satisfied the call by depositing $210,000 in its collateral account.  (Trial Ex. # 67.)

20.     On November 19, 2008, MLCS issued another collateral call for $210,000 which Apache did not meet on that day.  (Trial Ex. # # 71, 73.)

21.     On November 20, 2008, the November 19 collateral call increased to $430,000 and Alan Wong informed Mikail of the increase.  (Trial Ex. # 73.)  Even though the Deal Detail report attached to Alan Wong's email stated that the margin call was for $430,000, Alan Wong mistakenly told Apache in the body of the email that the collateral call was for $410,000.  (*Id.*)  Apache did not meet the collateral call that day.  (*Id*.)

22.     In expectation of Apache meeting the November 20 collateral call, Merrill Lynch's Collateral Group issued a preadvise informing Citibank to expect a $430,000 deposit.  (Atwood Decl. ¶ 29.)  On November 20, when a different MLCS counterparty, not Apache, coincidentally wired Citibank $430,000, Citibank closed the preadvise and MLCS mistakenly credited $430,000 to Apache's collateral account.  (*Id*.)

23.     Based on the mistaken amount requested in Wong's November 20 email, Apache transferred $410,000 into its Brokerage Account on November 21.  Because the market moved in Apache's favor, MLPFS only transferred $290,000 out of the $410,000 into Apache's Collateral Account.  (Admitted Fact # 20.)

24.     From November 24, 2008 to November 26, 2008, MLCS sent CVG reports to Ramin Alizadeh.  Unlike previous CVG reports, these emails did not list Halston Mikail as a recipient.  (Trial Ex.  ## 77, 78, 80.)  There is no evidence that Mikail called to request these reports on those days in which he claims not to have received them.  During this time period, the present value of Apache's swap contracts decreased by $139,160.  (*Id*.)  On November 27, 2008, MLCS resumed its previous practice of emailing CVG reports to Halston Mikail as well as Alan Wong and Ramin Alizadeh—the value of the swap agreement reflected in the November 27 transmission was for the close of business on November 26.  (Trial Ex. # 81.)

25.     On November 26, Alan Wong incorrectly informed Halston Mikail's assistant, Lynda Alvarado, that the MTM of Apache's swap contracts was negative

$43,839.[2]  (Trial Ex. # 79.)   He also told Alvarado that Apache had $125,000 in its brokerage account which could be refunded to Apache.  (*Id.*)  These numbers represented the amount listed for Apache's accounts but they included the $430,000 that was mistakenly credited to the account on November 20.

26.    On November 26, 2008, Apache told MLPFS to transfer $125,000 from its brokerage account to a "Stanford Structures" account at First Republic Bank and MLPFS fulfilled that request.  (Admitted Fact # 21.)

27.    Halston Mikail claims that he relied on the collateral calls issued by MLCS to monitor the value of his swap contract rather than inspecting the CVG reports themselves.  He also asserts that he had decided as of November 20 to unwind his swap contracts with MLCS upon receiving the next collateral call.  According to Mikail, if he had received an earlier collateral call from MLCS, he would have unwound his swap contracts earlier when the cost of unwinding would have been much less.  (Mikail Decl. ¶¶ 14-26.)  Several facts in the evidentiary record cast doubt on this claim and undermine his credibility.  First, collateral calls are for the benefit of MLCS and are designed to protect MLCS if Apache is unable to cover the cost of unwinding the swap contracts. (Atwood Decl. ¶ 12; Fortgang Decl., Ex. C at 000005.)  Collateral calls are not for the benefit of Apache nor are they a mechanism for notifying a party of the fluctuations in the value of its contracts.  (Fortgang Decl. Ex. C at 000006 ("Collateral offers no benefit whatsoever to the buyer of the swap.")  The amount in the collateral account does not change the underlying present value of the swap contracts.  Second, Mikail was a sophisticated investor who paid close attention to the value of his swap agreements.  In a prior meeting convened by Mikail to discuss interest rate swap contracts, Mikail gave a PowerPoint presentation regarding these types of contracts.  In that presentation, Mikail

---

[2]  MTM has different meanings and uses within the finance industry but the parties stipulated at trial that, when used in communications between Alan Wong and Lynn Alvarado, the term "MTM" referred to the net cash in the collateral account.

does not mention liquidity or collateral calls as the basis for determining whether he would terminate swap contracts.  The PowerPoint focused on the value of the contracts and stated that "[w]e try to exit at any time we have 30 points of profit."[3]  (Trial Ex. # 18 at MLCS 001228.)  Third, in his declaration submitted in opposition to MLCS' motion for partial summary judgment, Mikail did not mention that he placed any reliance on the collateral calls to decide whether to terminate the swap contracts.  Rather, Mikail stated that "[a]fter the deposit of the $410,000 [on November 21], I checked **the value of the Apache swap account** on numerous occasions" and "communicated with Wong regarding the value of the account."  (Mikail Decl. in Opp'n to Pl.'s Motion for Partial Summary Judgment [Doc. # 56] ¶ 18 (emphasis added).)  Regarding his decision to maintain his swap contracts, Mikail explicitly stated that "[b]ased on the representations of Merrill Lynch and its employees *regarding the account values*, I continued with the swap account."  (*Id.* at ¶ 19 (emphasis added).)    Finally, Mikail stated that he chose to unwind the account on December 1, 2008, because he "determined that Apache's *account values* had declined significantly."  (*Id.* at ¶ 20 (emphasis added).)

28.    In his declaration filed in connection with the trial (Mikail Decl. [Doc. # 86]) and during his trial testimony, Mikail modified the statements described in the preceding paragraph and claimed he relied on collateral calls rather than CVG reports for information on the present value of his swap contracts.   According to his trial testimony and declaration, he had decided in November 2008 to unwind with the next margin call. (Mikail Decl. ¶¶ 18-20.)  Due to the facts outlined above and the inconsistencies in the evidence, the Court finds that Mikail's trial declaration and testimony are not credible.

29.    Mikail also claims he was unaware of the amount of money in his collateral account and instead relied on MLCS for that information.  Unlike the value of the swap contract itself, the amount of collateral Apache posted was an amount which Apache

---

[3] A "point of profit" refers to a basis point movement in the interest rate.    (Trial Ex. # 18 at MLCS 001228-001229.)

could have estimated.  Mikail kept a close eye on the amount of collateral in his account.
(Trial Ex. # 21.)  Reasonable attention to Apache's Counterparty Deal Detail Report of
November 19, 2008 and the next such report on December 1, 2008 would have revealed
that the settled cash in the collateral account was $430,000 more than what should have
been on deposit given Apache's single transfer of $290,000 into its collateral account.
(Trial Ex. ## 71, 84; Fortgang Decl., Ex. C at 000006-7.)  Given Mikail's sophistication
and apparent attention to his investment, it strains credulity that he would not have noted
an unwarranted $430,000 credit to his collateral account.

30.   Mikail did not inform anyone at MLCS that he planned to unwind his swap
contracts at the next collateral call.  Additionally, Mikail did not communicate to anyone
at MLCS that he was concerned about the amount of collateral he was posting or that
Apache was having liquidity problems.  In fact, a Merrill Lynch branch manager
indicated that Mikail told him in an April 2008 interview that he had "plenty" of cash to
cover margin calls.  (Trial Ex. # 29.)  For example, in April 2008, Apache had over $2
million in its collateral account.  (Atwood Decl., ¶ 23c.)

### Unwinding The Swap Contracts And The Realization Of The Mistake

31.   On December 1, 2008, MLCS issued a $130,000 collateral call to Apache.
(Trial Ex. # 84.)  Alizadeh sent an email to Lynda Alvarado informing Apache of the
margin call and attached a Deal Detail report.  (*Id.*)  This report represented that the net
deficit in Apache's account equaled $127,256.[4]  (*Id.*)  On the same day, Apache decided
to unwind its swap contracts.  (Admitted Fact # 22.)  Mikail testified at trial that, because
he was travelling at the time, he did not see the deal report that accompanied the
collateral call or any CVG reports until days after the decision to unwind the contract.
Rather, he claims that he made the decision to unwind once Lynda Alvarado informed
him that MLCS issued another collateral call.  (*Id.*)

---

[4]When issuing margin calls, MLCS would round the amount of the deficit to the nearest ten
thousand.

32.     On December 2, 2008, Apache unwound its August 2007 swap contract with a notional amount of $5 million and its October 2007 swap contract with a notional amount of $5.1 million.  (Admitted Fact # 22.)

33.     Unwinding the two swap contracts cost Apache a total of $2,075,000.  (Trial Ex.  ## 90, 92.)  MLCS and Apache entered into two separate termination agreements in order to unwind the two swap contracts.  Both termination agreements or "Confirmations" stated that the "Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement dated as of July 26, 2007."  (*Id.*)  These agreements released both parties of any obligations or claims "arising and to be performed in connection with the Transaction after December 4, 2008."  (*Id.*)  Neither agreement released the parties' claims arising from the transaction *before* December 4, 2008.  Therefore, the release language contained in the termination agreements does not affect the rights of either party to bring the claims herein, which arose before December 4, 2008.

34.     According to a Deal Detail report dated December 1, 2008, Apache had $2,134,259 in its Collateral Account at the time of the unwind.  (Trial Ex. # 84.)  On November 20, 2008, Apache had approximately $1,414,000 in its collateral account.  (Trial Ex. ## 73, 97 at MLCS 000656.)  The difference between the settled cash in Apache's Collateral Account on December 1 and November 20 equaled $720,259.  Other than the $290,000 wired from Apache's Brokerage Account to its Collateral Account on November 21, Apache did not place any additional funds into its Collateral Account between November 20 and December 1.   Thus, the $2,134,259 in settled cash included the $430,000 mistakenly credited to Apache's account on November 20, 2008 ($720,259 - $290,000 = $430,259).

35.     On or about December 11, 2008, MLCS refunded the perceived excess of $59,430[5] into Apache's Brokerage Account and MLPFS transferred the total amount of $61,370 contained in the Brokerage Account to Apache.  (Admitted Fact # 23; Trial Ex. ## 94, 95 at MLCS 000209.)

36.     On January 2, 2009, MLCS discovered that it had mistakenly posted a $430,000 credit in Apache's account when the third party to whom the $430,000 actually belonged made inquiries regarding his November 20, 2008 Citibank deposit.  MLCS then informed Alan Wong of the mistake on or about January 5, 2009.  (Wong Decl. ¶ 21.)

37.     On or about January 8, 2009, MLCS informed Apache of the $430,000 mistaken credit.  MLCS demanded that Apache repay the $430,000 and Apache refused to repay that amount.  (Trial Ex. # 101.)

38.     Of the amount in the collateral account that MLCS used to satisfy the amount owed by Apache under the termination agreements, $430,000 did not belong to Apache.  Apache owed $2,075,000 on its two swap contracts, but paid only $1,704,000, resulting in an underpayment of $371,000.[6]  Apache received a refund of an additional $59,430.  Thus, Apache underperformed by the amount of $430,430 ($371,000 + $59,430).  Apache's failure to pay the correct amount owed to unwind the swap agreements constituted a breach of the parties' contract, which proximately caused MLCS's injury.

---

[5] The excess amount would appear to be $59,259 based upon the difference between the amount in the collateral account and the total unwind cost ($2,134,259 - $2,075,000). As the amount that MLCS refunded to Apache is reflected in Trial Exhibit # 95—i.e., $59,430—the Court uses the figure reflected in that document.

[6] The amount paid by Apache includes the $1,414,000 in the collateral account on November 20, 2008 plus the $290,000 Apache deposited into the collateral account on November 21, 2008, for a combined total of $1,704,000.

**Apache Cannot Show That MLCS's Breach of Its Duty of Care Was the Proximate Cause of Any Injury that Apache Suffered**

39.     MLCS's conduct was sloppy at best and it could have easily avoided the error that occurred on November 20, 2008 by notifying Citibank in its "preadvise" of the identity of the entity from which it expected to receive a deposit or by using some other unique identifier.  MLCS breached its duty to Apache by crediting $430,000 of a third party's money to Apache's collateral account and then misstating the amount of money in Apache's collateral account.  The evidence clearly shows, and MLCS readily admits, that MLCS incorrectly credited Apache's account.  This mistake went unnoticed by MLCS for over a month before being discovered.  Due to this error, Alan Wong misrepresented the net amount in Apache's collateral account.  This accounting error and subsequent misrepresentation amounted to a breach of MLCS's duty of care to Apache.

40.     Notwithstanding MLCS's breach of its duty of care, Apache did not carry its burden of establishing that MLCS's failure to accurately maintain Apache's collateral account and the subsequent misrepresentations caused by that error were the proximate cause of any injury to Apache.  Apache claims it relied on MLCS's omissions and misrepresentations regarding the collateral calls when deciding to maintain its swap contracts as long as it did and therefore MLCS's breach proximately caused the losses Apache suffered from maintaining its position in the swap agreements until December 1, 2008.  Apache contends that, had MLCS made a collateral call earlier (i.e., if it had not mistakenly credited $430,000 to Apache's account), it would have decided to unwind earlier and thereby sustained less of a loss in value in its swap agreements.  As detailed above, Mikail's assertions regarding the motivations for his decisions changed from the time of the hearing on MLCS's summary judgment motion to the time of trial.  Originally, in his declaration submitted for the summary judgment motion, Mikail claimed he closely monitored the present value of his contracts and considered the swap account values when determining whether to continue with his swap contracts.  At trial, however, Mikail claims he relied heavily on the collateral calls to make his decisions

about whether or not to continue with the swap contracts.  Mikail testified that he did not even look at the Deal Detail report when making the decision to unwind the contract on December 1.  The Court does not find this testimony to be credible as it is not reasonable behavior on the part of a seasoned investor.

41.   Apache urges this Court to unwind the swap agreements as of November 20, 2008, the date on which MLCS erroneously credited Apache's collateral account with $430,000.  According to Apache, the cost of unwinding on November 20, 2008 would have been $1,437,530[7]—as compared to $2,075,000 on December 1, 2008—and therefore it is MLCS that owes Apache money rather than the other way around.  (Rende Decl. ¶ 29.)  Mikail's testimony that Apache would have unwound on an earlier date is as speculative as it is self-serving.  There is no evidence in the record that Apache would have unwound the swap agreements as of November 20.  In fact, on November 21, 2008, Apache was poised to make a $410,000 deposit into its collateral account in response to a collateral call on November 20.  Due to its accounting error, MLCS prevented Apache from making that deposit and instead transferred only $290,000 into Apache's collateral account.  (Admitted Fact # 20.)  Despite Apache's claim that it was encountering liquidity problems, Apache received and responded to substantial collateral calls from November 19 to November 21, 2008, as well as earlier in the year, and did not unwind its position.  (Atwood Decl., ¶ 23.)  Based on the totality of these facts, the Court finds that Apache has not carried its burden of establishing that MLCS' failure to accurately maintain Apache's collateral account was the proximate cause of its harm.[8]

---

[7] The November 20, 2008 CVG report reflects the present value of the swap contracts as of close of business the previous day, i.e., November 19, 2008.  (Trial Ex. ## 72, 73.)  Therefore, even under Apache's theory of recovery, the cost of unwinding would not have been the present value extant as of November 19, 2008.

[8] A finding of proximate cause is generally a question of fact rather than a legal question.  *See e.g., Stern v. Easter,* 92 A.D.3d 1250, 1252, 938 N.Y.S.2d 391 (2012) (internal citations and quotations omitted).

-14-

## II.   <u>CONCLUSIONS OF LAW</u>

1.     The Court has subject matter jurisdiction over this matter based on diversity jurisdiction under 28 U.S.C. § 1332(a).  The parties are residents of different states and the amount in controversy is greater than $75,000.  Venue is proper in the Central District of California because Defendant resides in this District.

2.     The parties' written agreement contains a choice-of-law clause, requiring the application of New York law.

3.     The parties' contractual choice-of-law provision is enforceable, the parties agree that New York law applies, and therefore New York law governs the parties' dispute.

### <u>Apache Breached Its Contract With MLCS By Failing To Pay The Full Amount Required To Unwind The Swap Contracts</u>

4.     In order to recover for a claim of breach of contract under New York law, Plaintiff must prove:  (1) the parties had a contract; (2) Plaintiff performed its obligations under the contract; (3) Defendant breached the contract; and (4) Defendant's breach proximately caused the damage to Plaintiff.  *Diesel Props S.R.L. v. Greystone Business Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004)).

5.     MLCS established there was a contract between the parties, including the parties' version of the ISDA agreement, the two swap contracts at issue, and the termination agreements that supplemented the ISDA agreement.

6.     MLCS performed its material obligations under the contract.  Apache argues that it is relieved of the obligation to repay the excess funds credited to its account because an "Event of Default" occurred, i.e., MLCS made material misrepresentations regarding the amount in Apache's collateral account.  The Agreement provides that all obligations are subject to a condition precedent that no "Event of Default" has occurred and is continuing.  One event which constitutes an "Event of Default" under the Agreement is a representation made or repeated by a party which proves to be incorrect

1   or misleading in any material respect.  Despite the mistaken credit to Apache's account

2   and Apache's claims to the contrary, MLCS satisfied the condition precedent outlined in

3   Paragraph 2, Subsection (a)(iii) of the Agreement.

4         7.      In considering the "Event of Default" language in the ISDA agreement, this

5   Court must assign the words their plain and ordinary meaning.  *See Greenfield v. Philles*

6   *Records Inc.,* 98 N.Y.2d 562, 569, 780 N.E.2d 166 (2002) ( "[A] written agreement that is

7   complete, clear and unambiguous on its face must be enforced according to the plain

8   meaning of its terms.");  *Federal Ins. Co. v. American Home Assurance Co.,* 639 F.3d

9   557, 567 (2d Cir. 2011).  In order to ascertain the plain and ordinary meaning of words,

10  "[i]t is common practice for the courts of [New York] State to refer to the dictionary to

11  determine the plain and ordinary meaning of words to a contract."   *10 Ellicott Square*

12  *Court Corp. v. Mountain Valley Indem. Co.,* 634 F.3d 112, 120 (2d Cir. 2011) (quoting

13  *Mazzola v. Cnty. of Suffolk,* 143 A.D.2d 734, 735, 533 N.Y.S.2d 297 (1988) (internal

14  quotations omitted)).

15        8.      "Materiality exists whenever the misrepresentation would be likely to affect

16  the conduct of a reasonable person."  *See* 7 Joseph M. Perillo, *Corbin on Contracts* §

17  28.14 (2011).  *See also* 26 Richard A. Lord, *Williston on Contracts* § 69:12 (4th ed.

18  2011) ( "[M]any misrepresentation cases explicitly hold that a misrepresentation is

19  material if it has a natural tendency to influence the decision of a reasonable person.").

20  Black's Law Dictionary defines a material misrepresentation as "[a] false statement that

21  is likely to induce a reasonable person to assent or that the maker knows is likely to

22  induce the recipient to assent."  Black's Law Dictionary 1091 (9th ed. 2009).

23  Furthermore, "[t]he materiality of a misrepresentation is determined from the viewpoint

24  of the maker."  *Id.* (quoting Restatement (Second) of Contracts § 162 cmt. c (1981)).  In

25  other contexts, courts define materiality based on a similar objective inquiry.  For

26  example, for the purposes of Section 14 of the Securities Exchange Act, "[a] fact 'is

27  material if there is a substantial likelihood that a reasonable shareholder would consider it

28  important in deciding how to [act].'"  *Hutchison v. Deutsche Bank Securities, Inc.,* 647

F.3d 479, 485 (2d Cir. 2011) ( citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)) (internal quotations omitted).

9.     Because this Court finds that a reasonable party, especially a sophisticated investor like Mikhail, would not rely on representations regarding the amount of money in his collateral account when making decisions regarding whether to unwind interest rate swap contracts, the misrepresentations by MLPFS and MLCS about the amount in Apache's collateral account were not misleading in a material respect.  MLCS required Apache to post collateral for the benefit and protection of MLCS.  A reasonable party would base its decision on whether to unwind the swap agreement, not on the amount the counterparty had demanded to be deposited into a collateral account, but on the present value of the contract and the party's predictions about the future fluctuations in that value.

10.     MLCS carried its burden of establishing that Apache breached the contract by failing to pay the full cost for unwinding the swap agreements and that this breach was the proximate cause of the damage to MLCS.

**Plaintiff's Unjust Enrichment and Common Count Claims Fail Because The Subject Matter Is Governed By An Express Agreement**

11.     "New York has long recognized the rule that 'if A pays money to B upon the erroneous assumption of the former that he is indebted to the latter, an action may be maintained for its recovery.'" *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 366, 570 N.E.2d 189 (1991) (quoting *Ball v. Shepard,* 202 N.Y. 247, 253 (1911)).  "This rule has been applied where the cause of action has been denominated as one for money had and received, for unjust enrichment or restitution, or upon a theory of quasi contract." *Id* (internal citations omitted).

12.     MLCS's second cause of action is for unjust enrichment.  Although described in the complaint as a claim for "money paid for the benefit of another", the third cause of action is essentially a claim for money had and received. *See Matter of Moak,* 92 A.D.3d 1040, 1044, 938 N.Y.S.2d 648 (2012) (describing the essential

-17-

elements of a cause of action for money had and received); *Mfrs. Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 118, 559 N.Y.S.2d 704 (1990) ("Actions to recover money paid under mistake are frequently styled as actions for money had and received."). *See also Wagner v. Armsby*, 264 A.D. 379, 380, 35 N.Y.S.2d 488 (1942) (Dore, J., dissenting) (treating the expressions "money paid for the benefit of another" and "money had and received" as a way of articulating the same cause of action).

13.      Claims under the theory of unjust enrichment and for money had and received are quasi-contractual or seek relief under a contract implied-in-law.  *Diesel Props S.R.L. v. Greystone Business Credit II LLC,* 631 F.3d 42, 54 (2d Cir. 2011)("The theory of unjust enrichment lies as a quasi-contract claim.") (quoting *Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 572, 841 N.E.2d 742 (2005)); *Bd. of Educ. of Cold Spring Harbor Cent. Sch. Dist. v. Rettaliata*, 78 N.Y.2d 128, 138, 576 N.E.2d 716 (1991) ("A cause of action for money had and received is one of quasi-contract or of contract implied-in-law.").  Under both theories, the law creates an obligation in the *absence of any agreement.  Diesel Props,* 631 F.3d at 54 (emphasis added).

14.      Under New York law, MLCS may not recover under an unjust enrichment theory or a claim for money had and received for events arising out of subject matter governed by a valid and enforceable contract between the parties.  *IDT Corp. v. Morgan Stanley Dean Witter & Co,* 12 N.Y.3d 132, 142, 907 N.E.2d 268 (2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded.") (citing *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 516 N.E.2d 190 (1987)); *One Step Up, LTD., v. Webster Business Credit Corp.,* 87 A.D.3d 1, 14, 925 N.Y.S.2d 61 (2011) ( "The claims for unjust enrichment and money had and received are not viable because express contracts govern the same subject matter.") (internal citations omitted); *Fesseha v. TD Waterhouse Investor Servs., Inc.*, 305 A.D.2d 268, 269, 761 N.Y.S.2d 22 (2003) ("An action for

money had and received does not lie where there is an express contract between the parties.").

15.     Neither party disputes the validity of their express agreement.  Rather, as discussed *supra*, MLCS claims Apache breached the contract by not paying the full amount owed under the termination agreements and seeks to recover the difference. MLCS cannot claim that there is a valid agreement requiring Apache to pay the additional $430,000, yet also seek to recover the same money under theories of unjust enrichment or money had and received.  *See Sergeants Benevolent Assn. Annuity Fund v. Renck,* 19 A.D.3d 107, 119, 796 N.Y.S 2d 77 (2005) ("It is well settled that plaintiffs cannot recover for unjust enrichment while simultaneously alleging the existence of an express contract covering the same subject matter.") (internal quotations omitted) (quoting *MJM Adv. v. Panasonic Indus. Co.*, 294 A.D.2d 265, 266, 741 N.Y.S.2d 874 (2002)).  Thus, this Court finds that Plaintiff cannot recover under a theory of unjust enrichment or money had and received.

### Apache's Negligence Counterclaim Fails Because Apache Did Not Prove That MLCS's Breach of Duty Proximately Caused Apache's Injuries

16.     In order to recover for a negligence claim under New York law, Apache must prove three elements:  (1) MLCS owed a duty to Apache; (2) MLCS breached that duty; and (3) the breach was the proximate cause of injury to Apache.  *Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 17 N.Y.3d 565, 576, 958 N.E.2d 77 (2011); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006).

17.     The New York Court of Appeals has recognized that misrepresentations can be the source of liability for negligence in certain situations.

> Liability in negligence may of course rest on some form of written misrepresentation or nondisclosure on the part of defendant by which plaintiff or a third party is misled, resulting in injury or damage to plaintiff. The basis of liability is the fact that the misrepresentation or nondisclosure

has led the person to whom it was made to forego action that might

otherwise have been taken for the protection of the plaintiff. . . .

*Eiseman v. State of New York,* 70 N.Y.2d 175, 187, 511 N.E.2d 1128 (1987).

18.     "[T]he existence and scope of duty in tort cases is a question of law which requires the court to consider and weigh competing policy considerations." *Anand v. Kapoor*, 61 A.D.3d 787, 792, 877 N.Y.S.2d 425 (2009).  When determining whether a legally recognized duty exists, courts must balance "the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability." *Gilson v. Metropolitan Opera*, 5 N.Y.3d 574, 576-77, 841 N.E.2d 747 (2005) (citing *Matter of New York City Asbestos Litig.,* 5 N.Y.3d 486, 493, 840 N.E.2d 115 (2005)); *see also Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232, 750 N.E.2d 1055 (2001).

19.     There is a duty to provide correct information where one party knows that information is desired for a "serious purpose," the party giving information understands that the receiving party intends to rely on the information, the giving party knows that false information will cause the receiving party harm, and the relationship between the parties is such that "one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care." *Eiseman*, 70 N.Y.2d at 187-88 (quoting *International Prods. Co. v. Erie R.R. Co.*, 244 N.Y. 331, 338, 155 N.E. 662 (1927)).

20.     After considering the evidence and weighing the necessary public policy considerations, this Court finds that MLCS owed a duty of care to Apache to post credits and debits properly to Apache's collateral accounts.  Moreover, when Apache requested information regarding its accounts, MLCS had a duty to provide true and accurate information.

21.     Nonetheless, MLCS did not have a duty, contractual or otherwise, to issue collateral calls to Apache every time Apache's collateral account recorded a deficit of

$100,000 or more.  Rather, MLCS retained the right to issue such calls at its discretion in order to protect MLCS from the risk of an Apache default.  Thus, Apache cannot have relied upon MLCS's *failure* to issue a margin call.  Once it undertook to issue a collateral call, however, MLCS had a duty to provide accurate information in order to induce the counterparty to transmit the correct amount of money to the collateral account.

22.     In order for MLCS's breach to be the proximate cause of Apache's injury, Apache must establish that Plaintiff's error regarding the amount of collateral in Apache's account was a substantial cause of Apache's injuries.  *Maheshwari v. City of New York,* 2 N.Y.3d 288, 295, 810 N.E.2d 984 (2004) (citing *Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 314-15, 414 N.E.2d 666 (1980)).

23.     As detailed above in the Findings of Fact, Apache did not carry its burden of establishing that MLCS's failure to accurately maintain Apache's collateral account and the subsequent misrepresentations caused by that error were the proximate cause of any injury to Apache.  Apache had a duty to examine its own statements of the present value of its swap contracts, as disclosed in the CVG reports, or to demand a copy of such statements if it did not receive them—this was especially true given the acknowledged risk and volatility inherent in swap contracts during those turbulent economic times.  If there was a discrepancy in the amount in the collateral account based upon the present value of the swap agreement, Apache should have given MLCS notice of the error.  *Cf. B.B.C.F.D., S.A. v. Bank Julius Baer & Co.*, 910 N.Y.S.2D 43, 46 (2010) ("A depositor of a bank is under a duty to examine . . . statements of account and to give notice of errors therein."); *see also Turetsky v. Morris Plan Indus. Bank of N.Y.*, 22 N.Y.S.2d 514, 515 (1936) (*per curiam*) (the general rule is that "banks paying out money by mistake may recover even though they were negligent in making the mistake, provided no damage had been suffered by the party receiving the money").

### III.   **CONCLUSION**

1.      Apache breached its contract with MLCS by failing to pay the full amount required to unwind the two interest rate swap contracts.

2.      MLCS is entitled to the difference between what Apache paid and the actual cost of unwinding the swap contracts.  That amount equals $430,000, the rounded sum requested by MLCS.

3.      Because the contract does not specify a different interest rate, MLCS is entitled to 9% per annum prejudgment interest on the amount as mandated by New York statute.  N.Y. C.P.L.R. § 5001(a) (McKinney 2008) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract"); N.Y. C.P.L.R. § 5004 (McKinney 2008) ("Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute.").  MLCS informed Apache it owed the additional $430,000 on January 8, 2009 and this is the date from which the prejudgment interest shall be calculated.  N.Y. C.P.L.R. § 5001(b) (McKinney 2008) ("Interest shall be computed from the earliest ascertainable date the cause of action existed.")  In the interest of justice, prejudgment interest shall accrue only for the period from January 8, 2009 through the last day of trial, July 9, 2010.

4.      Under the terms of the Agreement, Apache must pay MLCS's reasonable expenses, including legal fees, incurred by MLCS in enforcing its rights under the Agreement.  Paragraph 11 of the Agreement states that the Defaulting Party will be responsible for "reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party . . . including, but not limited to, costs of collection."  (Trial Ex. # 3 at MLCS 000012-13.)  A Defaulting Party is described in Paragraph 6 Section (a) as a party who has engaged in an Event of Default.  In Paragraph 5 Section (a)(i), the Agreement specifies an Event of Default as a "[f]ailure by the party to make, when due, any payment under this Agreement."  (Trial Ex. # 3 at MLCS 000005.)  Because Apache failed to make the

payments specified in its termination agreements, Apache is required to pay MLCS's reasonable expenses.  MLCS may file a motion for reasonable fees and costs within 30 days from the date of this Order.

5.      MLCS's unjust enrichment and common count claims fail because the subject matter is governed by the Agreement between the two parties.

6.      Apache did not carry its burden of proving that MLCS's breach of duty was the proximate cause of any injury it sustained.  Therefore, Apache recovers nothing from MLCS under its counterclaim for negligence.

DATED:  July 11, 2012

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

-23-